## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Joshua A. Gardner,

             Plaintiff,

v.

State of Minnesota; Minnesota
Department of Human Services;
Minnesota Sex Offender Program; and
Brian Ninneman, Randy Gordon, Troy
Doe, and J. Doe, *all in their individual
and official capacities*,

             Defendants.

Case No. 16-cv-03999-JNE-KMM

REPORT AND
RECOMMENDATION

---

Zorislav R. Leyderman, The Law Office of Zorislav R. Leyderman, counsel for plaintiff

Bradley Richard Hutter, Minnesota Attorney General's Office, counsel for defendants

---

       Joshua A. Gardner is a patient who is involuntarily civilly committed to the Minnesota Sex Offender Program ("MSOP"). He brings this action under 42 U.S.C. § 1983, alleging that the defendants violated several of his constitutional rights when they subjected him to a strip-search after an incident at the MSOP facility in February of 2016. This matter is before the Court on the defendants' motion to dismiss. ECF No. 12. For the reasons outlined below, the Court recommends that the defendants' motion be granted and that the case be dismissed.[1]

---

[1]     The motion to dismiss was filed by the State of Minnesota, Minnesota Department of Human Services, MSOP, Brian Ninneman, and Randy Gordon. Two

## I.    Background

The defendants' motion to dismiss challenges the sufficiency of the Complaint on its face. For purposes of this decision, therefore, the Court accepts the factual allegations in Mr. Gardner's Complaint as true. *Barton v. Taber*, 820 F.3d 958, 963–64 (8th Cir. 2016).

Mr. Gardner was sexually abused by his uncle when he was a child. His experience included being forced to remove his clothing while his uncle recorded him with a video camera. This experience caused Mr. Gardner "deep emotional scars and trauma, which continue to this day." Compl. ¶ 9.

Years after that childhood trauma, on February 18, 2016 at the MSOP facility in Moose Lake, Mr. Gardner was standing near two other MSOP patients who got into a "brief physical encounter." Compl. ¶ 10. The encounter lasted under ten seconds and resulted in no physical injuries. *Id.* Mr. Gardner was not involved in the conflict. *Id.* After the brief incident ended, MSOP staff members gave Mr. Gardner verbal commands, with which he immediately complied. The staff members detained Mr. Gardner to investigate his possible involvement in the incident. *Id.* ¶ 11. Mr. Gardner denied any involvement and asked to be let go, but MSOP staff took him to the facility's High Security Area ("HSA") to discuss the events. *Id.* ¶¶ 11–12. The two other patients were also detained, and the facility was secured. *Id.* ¶ 12.

In the HSA, Mr. Gardner "was transferred into the custody of defendants Ninneman, Gordon, Troy Doe, and J. Doe." Compl. ¶ 13. Mr. Gardner told them that he was not involved in the fight, but the defendants did not release him. *Id.* None of the defendants suspected Mr. Gardner had a weapon or other

---

unidentified individual Doe defendants have not been served and defense counsel has not appeared on their behalf. As a result, the "Doe" defendants are not before the Court. Before a stay was entered on June 30, 2017, more than 90 days elapsed after the November 25, 2016 filing of the Complaint without the "Doe" defendants being served. *See* ECF Nos. 1, 24. Because they have not been timely served, the Court recommends that the claims against the "Doe" defendants be dismissed without prejudice, unless the plaintiff demonstrates good cause for the failure to serve. *See Ballinger v. Cedar County, Mo.*, 810 F.3d 557, 559 n.1 (8th Cir. 2016) (citing Fed. R. Civ. P. 4(m)).

contraband on him. *Id.* ¶ 14. Nevertheless, the defendants told him that he would be subjected to a videotaped strip-search procedure. *Id.*

Mr. Gardner "begged the Defendants to review the video surveillance recordings which would show that he was not involved in the incident and that the incident itself was not even a fight." Compl. ¶ 15. He also informed the defendants that he had been abused by his uncle as a child by being forced to remove his clothes while he was videotaped. *Id.* He explained that the search the defendants intended to conduct would cause him significant trauma. Despite his plea, the defendants refused his requests that they watch the surveillance footage before conducting the search. *Id.* The defendants told Mr. Gardner that his requests were being denied and that he would be forcibly strip-searched if he did not comply with their commands to remove his clothing. *Id.* ¶ 16.

The defendants placed Mr. Gardner into a room "where he was forced to strip naked and subjected to a strip search by Defendant Troy Doe while Defendant J. Doe video-recorded the entire procedure from a close distance. Defendants Ninneman and Gordon, both MSOP officers, also participated in the strip-search procedure by requesting and/or authorizing it." Compl. ¶ 16. This incident caused Mr. Gardner to relive his experience of childhood abuse. *See id.* ¶ 17. No weapons or contraband were discovered during the strip search. *Id.* ¶ 18.

Once the search was completed, the defendants reviewed the surveillance footage of the altercation; it confirmed that Mr. Gardner had not been involved in the incident. Compl. ¶ 19. Indeed, MSOP records show that "Gardner had no involvement in the altercation," and "the whole encounter [lasted] less than 10 seconds [and that the incident resulted in no] physical harm." *Id.* (second alteration in Complaint). Because Mr. Gardner's "behavior did not meet the criteria for Protective Isolation Status," the defendants released him and informed him he was cleared of any wrongdoing. *Id.*

### Claims for Relief

Based on the events discussed above, Mr. Gardner brought suit against the State of Minnesota, the Minnesota Department of Human Services ("DHS"), MSOP, and staff members at MSOP, raising several constitutional claims pursuant to § 1983. First, he alleges that the individual defendants (Ninneman,

Gordon, Troy Doe, and J. Doe) violated his Fourth Amendment right to be free from unreasonable searches. Compl., Count 1 ¶¶ 23–25. Specifically, he asserts that he was subjected to an "unreasonable and unjustified strip-search." *Id.* ¶ 24. Second, Mr. Gardner asserts that the individual defendants' conduct violated his procedural and substantive due-process rights under the Fourteenth Amendment. *Id.*, Count 2 ¶¶ 26–28. He contends that the individual defendants' actions violated his procedural due-process rights because he was transferred to the HSA without justification, while his substantive due-process rights were violated as a result of the search. *Id.* ¶ 27.

Finally, Mr. Gardner claims that the State of Minnesota, DHS, MSOP, and the individual defendants in their official capacities violated his rights under Fourth and Fourteenth Amendments. Compl., Count 3 ¶¶ 29–33. Mr. Gardner asserts that the strip-search procedure could have been avoided if the defendants had simply detained him briefly in one of many secured areas in the MSOP facility, such as the one where the search was conducted, and investigated the incident by reviewing the video first. Compl. ¶ 20. However, Mr. Gardner asserts that MSOP policies allow the use of "unnecessary video-recorded strip searches of MSOP patients without justification and without a reasonable investigation." *Id.* ¶ 21. Moreover, "MSOP fails to train its staff to refrain from strip-searching patients unless there is at least some suspicion that the patient committed a crime or violated some MSOP policy or procedure." *Id.* These policies and lack of training allow "MSOP employees [to] believe[ ] that their actions would not be properly monitored by supervisory employees and that misconduct would not be investigated or sanctioned, but would be tolerated," causing the alleged violations of Mr. Gardner's constitutional rights. *Id.* ¶¶ 32–33.

In his Prayer for Relief, Mr. Gardner seeks an order finding that his Fourth and Fourteenth Amendment rights were violated by the defendants. Compl., Prayer for Relief ¶ a. He also seeks compensatory and punitive damages from the individual defendants in their individual capacities. *Id.* ¶¶ b–c. Further, he asks for an injunction requiring the State of Minnesota, DHS, and MSOP "to implement new policies and training which prohibit and discourage unjustified and unreasonable strip searches of MSOP clients." *Id.* ¶ d. Finally, he requests an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

II.    Legal Standards: Fed. R. Civ. P. 12(b)(1) and 12(b)(6)

The defendants bring their motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Defs.' Mem. at 1, 4–5, ECF No. 14. Under the circumstances here, the legal standard applied by the Court is the same under both provisions. On a motion to dismiss for failure to state a claim under Rule 12(b)(6), courts review the complaint to determine whether it contains sufficient factual allegations, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible when the factual content permits the court to draw a reasonable inference that the defendant is liable for misconduct. *Id.* The Court does not accept as true wholly conclusory statements or legal conclusions drawn from the facts. *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999); *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). In resolving such a motion, courts look only at the allegations in the complaint and do not consider matters "outside the pleadings." *See Gorog v. Best Buy Co., Inc.*, 760 F.3d 787, 791 (8th Cir. 2014).

A motion under Rule 12(b)(1) challenges a federal court's subject-matter jurisdiction over a dispute. Fed. R. Civ. P. 12(b)(1). Where such a motion is based only on the sufficiency of the allegations in a complaint, it is called a "facial" challenge to the court's jurisdiction. *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). Here, the defendants' have brought a facial challenge to the Court's jurisdiction based on the doctrine of sovereign immunity. "[S]overeign immunity ... is a jurisdictional threshold matter." *Lors v. Dean*, 746 F.3d 857, 861 (8th Cir. 2014) (internal quotation marks omitted). Because the defendants raise this jurisdictional issue based only on the allegations in the Complaint, the Court applies the same standards discussed above. *Osborn*, 918 F.2d at 729 n.6 ("In [a facial attack], the court restricts itself to the face of the pleadings ... and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6).").

III.   Sovereign Immunity

The defendants raise two sovereign-immunity arguments. First, the State, DHS, and MSOP argue that Mr. Gardner's claims against them cannot proceed because they are immune from suit under the Eleventh Amendment. Defs.' Mem.

at 5. Second, both Ninneman and Gordon argue that Mr. Gardner's claims for monetary damages brought against them in their official-capacities are no different from a suit against the State itself and must be dismissed based on the State's Eleventh Amendment immunity. *Id.* at 6. Mr. Gardner did not address these arguments in his response to the motion to dismiss. Pl.'s Resp., ECF No. 17.

Under the Eleventh Amendment, a state that has not consented to be sued is immunized "from damage actions brought in federal court, except when Congress has abrogated that immunity for a particular cause of action." *Becker v. University of Nebraska at Omaha*, 191 F.3d 904, 908 (8th Cir. 1999) (citing *Hadley v. North Arkansas Community Technical College*, 76 F.3d 1437, 1438 (8th Cir. 1996)). This immunity prevents both actions brought against the state directly, and actions brought against state agencies and instrumentalities. *Id.* Congress did not abrogate states' Eleventh Amendment immunity when it passed § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66–67 (1989).

The State of Minnesota, DHS, and MSOP are entitled to sovereign immunity under these rules. Minnesota has not explicitly consented to suit in federal court and § 1983 does not provide an avenue for Mr. Gardner's claims against the State via the abrogation exception. DHS is an agency of the State, and MSOP is operated and maintained by DHS. Minn. Stat. § 246B.02. They are, therefore, agencies and instrumentalities of the State of Minnesota that are entitled to invoke the State's sovereign immunity.

Although Mr. Gardner alleges in his Complaint that he seeks only prospective injunctive relief against DHS and MSOP, *see* Compl. ¶ 6, this does not change the fact that sovereign immunity bars his claims. "In the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment. This jurisdictional bar applies regardless of the nature of the relief sought." *Rose v. State of Nebraska*, 748 F.2d 1258, 1262 (8th Cir. 1984) (quoting *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 (1984); *Ernst v. Hinchliff*, 129 F. Supp. 3d 695, 722 (D. Minn. 2015) ("Moreover, while under the doctrine of *Ex parte Young*, state officials may be sued in their official capacities for prospective injunctive relief without violating the Eleventh Amendment, the

same doctrine does not extend to states or state agencies.") (alteration and internal quotation marks omitted).[2]

To the extent that Mr. Gardner asserts official-capacity claims for monetary damages against the individual defendants Ninneman and Gordon, those claims should also be dismissed on sovereign-immunity grounds. "A suit against state employees in their official capacities is the functional equivalent of a suit against the State." *Zajrael v. Harmon*, 677 F.3d 353, 355 (8th Cir. 2012). This is so because "the real party in interest in an official-capacity suit is the governmental entity and not the named official...." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). As such, any official-capacity claims for monetary damages against the MSOP employees Ninneman and Gordon should be dismissed because they are prohibited by the Eleventh Amendment. *Treleven v. Univ. of Minn.*, 73 F.3d 816, 818 (8th Cir. 1996).

For these reasons, the Court concludes that it lacks subject-matter jurisdiction over the claims in Count 3 of Mr. Gardner's Complaint against the State of Minnesota, DHS, and MSOP based on Eleventh Amendment sovereign immunity. Moreover, the Court lacks jurisdiction over any official-capacity claims for damages against the individual defendants. The defendants' motion to dismiss these claims under Rule 12(b)(1) should be granted, and they should be dismissed without prejudice. *Hart v. United States*, 630 F.3d 1085, 1091 (8th Cir. 2011) (affirming dismissal for lack of subject-matter jurisdiction but modifying the dismissal to be without prejudice).

## IV.   Due Process Claims

The defendants next argue that Mr. Gardner has failed to state a plausible individual-capacity claim against Ninneman or Gordon for any violation of his

---

[2]      Mr. Gardner appears to have added the allegation that he seeks only prospective injunctive relief against DHS and MSOP as a means of invoking the exception to Eleventh Amendment immunity recognized in *Ex parte Young*, 209 U.S. 123 (1908). This exception permits "federal jurisdiction over a suit against a state official when that suit seeks only prospective injunctive relief in order to end a continuing violation of federal law." *Carlson v. Ritchie*, 960 F. Supp. 2d 943, 950 (D. Minn. 2013). But neither DHS nor MSOP are state officials to whom the *Ex parte Young* exception would apply.

procedural or substantive rights under the Due Process Clause of the Fourteenth Amendment for several reasons. Defs.' Mem. at 8–13. They argue that the substantive due process claim fails because the alleged conduct is insufficiently outrageous or egregious. *Id.* at 8–10. Further, they argue that Mr. Gardner fails to state a procedural due-process claim because: (1) he has not alleged a protected liberty interest; (2) was not deprived of the process to which he was entitled; and (3) Ninneman and Gordon were not involved in his transfer to HSA. *Id.* at 10–13. Mr. Gardner did not contest the defendants' position on these claims in his response to the motion to dismiss.

### Substantive Due Process

The substantive component of the Due Process Clause of the Fourteenth Amendment protects "the right to personal security, as an 'historic liberty interest.'" *Semler v. Ludeman*, No. 09-cv-0732 (ADM/SRN), 2010 WL 145275, at *25 (D. Minn. Jan. 8, 2010) (order adopting R&R). An individual's substantive due process rights "prevent[] the government from engaging in conduct that 'shocks the conscience,' ... or interferes with rights 'implicit in the concept of ordered liberty.'" *United States v. Salerno*, 481 U.S. 739, 746 (1987) (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952) and *Palko v. Connecticut*, 302 U.S. 319, 325–26 (1937)); *Karsjens v. Piper*, 845 F.3d 394, 408 (8th Cir. 2017) (same). "Only in the rare situation when the state action is 'truly egregious and extraordinary' will a substantive due process claim arise." *Strutton v. Meade*, 668 F.3d 549, 557 (8th Cir. 2012) (quoting *Chesterfield Dev. Corp. v. City of Chesterfield*, 963 F.2d 1102, 1104–05 (8th Cir. 1992)).

In determining whether a defendant's conduct was conscience-shocking, "the district court should consider whether the ... actions were egregious or outrageous." *Karsjens*, 845 F.3d at 408. Under Eighth Circuit law, this is a difficult standard to meet:

> To meet this high standard, we have explained that the alleged substantive due process violations must involve conduct so severe ... so disproportionate to the need presented, and ... so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.

*Id.* (internal quotation marks omitted).

Courts applying this standard must also "balance the liberty interest of the individual against relevant state interests," asking whether the official action is reasonably related to legitimate government aims. *Semler*, 2010 WL 145275, at *26 (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)). Where the challenged state action requires the use of professional judgment, courts should not "'specify which of several professionally acceptable choices should have been made.'" *Id.* (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)).

Mr. Gardner asserts that the manner in which Ninneman and Gordon conducted, requested, or authorized his search was outrageous and did not serve any legitimate governmental interest. Compl., Count 2 ¶ 27 ("Defendants ... violated Plaintiff's constitutional right ... to substantive due process of law by subjecting him to an unreasonable, unjustified, and conscience-shocking strip-search."). Taken in the light most favorable to Mr. Gardner, the factual allegations in the Complaint show that Ninneman and Gordon knew there was surveillance footage of the incident that could have been reviewed prior to Mr. Gardner being strip searched. They also knew he claimed to have had no involvement with the altercation involving the other MSOP patients. Nothing about the incident suggested that Mr. Gardner had a weapon on his person or possessed any contraband. Indeed, the officers were aware that no one had been injured during the altercation. At the time the search was conducted, the facility had already been secured and Mr. Gardner was isolated in the HSA. And Mr. Gardner informed them that requiring him to remove his clothing for the search while videotaping him would be traumatic based on the events of his childhood. Nevertheless, Ninneman and Gordon initiated the strip-search procedure prior to reviewing surveillance footage of the minor altercation.

These allegations fail to state a substantive due-process claim against Ninneman and Gordon because their alleged conduct was not sufficiently egregious or outrageous to meet the requisite high standard. Mr. Gardner's allegations permit a reasonable inference that Ninneman and Gordon authorized the search of Mr. Gardner while other investigative options were available. For example, they could have waited to decide whether to conduct a strip search until they had reviewed surveillance footage. The allegations also permit an inference that, had they done so, the strip-search procedure in this case would have been unnecessary. But Ninneman and Gordon chose a different option, rejecting Mr. Gardner's protestations of innocence and his pleas that his past

9

experiences of abuse be taken into consideration. They began their investigation by first requiring him to submit to the strip search. Even if this choice failed to demonstrate the greatest respect for Mr. Gardner's humanity, the Court cannot conclude that Ninneman and Gordon's alleged conduct was so disproportionate to the need to investigate the altercation that occurred that it was inspired by malice or sadism and amounted to a brutal and inhumane abuse of official power. Nor can the Court conclude that their choice was one that required no professional judgment about which choice was appropriate under the circumstances.

Other "unclothed visual body searches" at the MSOP facility have been found not to violate substantive due process. In *Semler*, MSOP patients challenged a policy requiring them to submit to strip searches following contact with family, friends, and attorneys. 2010 WL 145275, at *27. The *Semler* court noted that the MSOP policy requiring such searches was designed to prevent contraband from entering the facility and ensure safety of the staff and other patient. *Id.* Weighing the intrusiveness of the search procedures against these valid governmental objectives, the court concluded that the MSOP defendants' "interest in maintaining security prevails." *Id.* (recommending dismissal of MSOP patients' substantive due process claims). As with the searches at issue in *Semler*, the search of Mr. Gardner was intrusive. But the staff at MSOP have a legitimate government interest in maintaining safety and security at the institution. While that interest could have been served in this case with taking a less intrusive approach initially, that does not mean the choice Ninneman and Gordon made was an abuse of power that shocks the conscience.

For these reasons, the Court concludes that Mr. Gardner has failed to state a claim for a violation of his substantive due-process rights. The defendants' motion should be granted in this respect and Mr. Gardner's substantive due-process claims in Count 2 of the Complaint should be dismissed with prejudice.

### Procedural Due Process

To state a claim for a violation of his procedural due-process rights requires Mr. Gardner to allege facts showing that: (1) he was deprived of a protected liberty or property interest; and (2) the defendants failed to provide him the process he was due, considering the interest affected, the likelihood that

the procedures used would result in erroneous deprivation, and the defendants' interests in providing the process that it did. *See Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006) (considering MSOP patient's claim that his placement in isolation violated his procedural due-process rights). The Court need only reach the second requirement if a plaintiff shows that a liberty or property interest is at stake. *See Bealieu v. Ludeman*, 690 F.3d 1017, 1047 (8th Cir. 2012).

With respect to the first requirement, the Eighth Circuit has held that the liberty interests of individuals who are involuntarily civilly committed that are "considerably less than those held by members of free society." *Id.* In such cases, there exist "*de minimus* level[s] of imposition with which the Constitution is not concerned." *Holly v.* Anderson, No. 04-cv-1489, (JMR/FLN), 2008 WL 1773093, at *7 (D. Minn. Apr. 15, 2018) (order adopting R&R) (quoting *Bell*, 441 U.S. at 539 n.21). In the prison context, courts determining whether an official action has deprived an inmate of a liberty interest have asked whether the action "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). This standard has been applied in cases involving procedural due-process claims by plaintiffs who have been involuntarily civilly committed as sexually violent persons. *Thielman v. Leean*, 282 F.3d 478, 484 (7th Cir. 2002) (concluding that "to state a procedural due process claim ... Thielman must identify a right to be free from restraint that imposes atypical and significant hardship in relation to the ordinary incidents of confinement").

The Court concludes that Mr. Gardner has failed to state a procedural due-process claim because his allegations do not show that his transfer to the HSA was anything more than a *de minimus* imposition.[3] Assuming the facts alleged in the Complaint are true and taking the reasonable inferences from

---

[3]    Mr. Gardner's procedural due process claim is based on the defendants' decision to place him in the HSA. Compl., Count 2 ¶ 27 ("Defendants ... violated Plaintiff's constitutional right to procedural due process of law by transferring Plaintiff into the HSA without justification...."). He does not allege that the search of his person was a violation of his procedural due process rights, nor has he raised such an argument in response to the motion to dismiss.

them in Mr. Gardner's favor, he alleges that he was taken to HSA for only a brief period. He states that he was detained temporarily shortly after the altercation between the other patients ended and was held in HSA until the investigation concluded. He does not specifically state how long he was detained in the HSA, but the reasonable inference to be drawn from his factual allegations is that he was placed in and released from HSA on the same day, February 18, 2016. In the analogous context of prison inmates, the Court notes that liberty interests have only been found to be implicated by much longer periods of segregated confinement. *See, e.g.*, *Williams v. Norris*, 277 Fed. App'x 647, 648–49 (8th Cir. 2008) (per curiam) (agreeing that twelve-year period in administrative segregation was an atypical and significant hardship); *Herron v. Schriro*, 11 Fed. App'x 659, 661–62 (8th Cir. 2001) (involving an inmate's claim regarding thirteen years in administrative segregation). Here, the Court concludes that even in the light most favorable to Mr. Gardner, he has failed to allege the violation of a liberty interest.

Even if Mr. Gardner's temporary placement in the HSA did implicate a protected liberty interest, he nevertheless fails to allege that he received less process than he was due. Fundamentally, due process requires that a person receive reasonable notice of the state action and an opportunity to be heard at a meaningful time and in a meaningful manner. *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotations omitted); *Mulane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). However, those protections need not always be afforded prior to state action implicating a liberty interest. One exception to the "general rule that predeprivation notice and hearing are required ... applies where there is a need for quick action by the State when there is a compelling or overriding state interest in a summary adjudication." *Keating v. Nebraska Public Power Dist.*, 562 F.3d 923, 928 (8th Cir. 2009) (internal quotations omitted). Even considering Mr. Gardner's allegations through the favorable lens required at this stage, given his close proximity to the altercation between the two other patients, in the moments immediately after it occurred, MSOP staff plainly needed quick action to determine who was involved and whether any safety risk remained. And following those urgent, exigent circumstances, Mr. Gardner does not allege that MSOP had no available postdeprivation procedures by which he could have meaningfully obtained an opportunity to be heard regarding his brief transfer to HSA.

For these reasons, the Court concludes that Mr. Gardner has failed to state a procedural due-process claim in Count 2 of his Complaint. The defendants' motion should be granted as to this claim and it should be dismissed with prejudice.

## V.    Fourth Amendment § 1983 Claim Against the Individual Defendants

Defendants Ninneman and Gordon argue that Mr. Gardner's Fourth Amendment claims must be dismissed because: (1) under the circumstances alleged in the Complaint, he has failed plausibly allege a constitutional violation occurred; and (2) they are entitled to qualified immunity. Defs.' Mem. at 6–8, 14–16. Mr. Gardner contends that the strip search was constitutionally unreasonable and violated the Fourth Amendment. Pl.'s Resp. at 7–14. He further asserts that at the time of the search, the law clearly established that Ninneman and Gordon's actions were unconstitutional. *Id.* at 16–19. For the reasons set forth below, the Court finds that, although a constitutional violation occurred, the individual defendants are entitled to qualified immunity.

### Legality of the Search

A person subject to involuntary civil commitment retains the Fourth Amendment right to be free from unreasonable searches. *Beaulieu v. Ludeman*, 690 F.3d 1017, 1028 (8th Cir. 2012) ("Under this court's precedent, involuntarily civilly committed persons retain the Fourth Amendment right to be free from unreasonable searches ....") (citing *Serna v. Goodno,* 567 F.3d 944, 948–49 (8th Cir. 2009)). This right, which is more robust than that of inmates serving prison sentences, is "analogous to the right retained by pretrial detainees." *Id.*; *see also Carter v. Huterson*, 831 F.3d 1104, 1108 (8th Cir. 2016) (quoting *Beaulieu*, 690 F.3d at 1028). To determine whether a search of a civilly committed person is reasonable under the Fourth Amendment courts apply a balancing test, which weighs "the need for the particular search against the invasion of rights that the search entails." *Serna v. Goodno*, 567 F.3d 944, 949 (quoting *Bell*, 441 U.S. at 559). Courts must also consider the intrusion at issue, how and where the search was conducted, and the reason for initiating it. *Id.*

Suspicion concerning the individual's conduct is "relevant to the analysis" of a Fourth Amendment issue in this context, *Serna*, 567 F.3d at 951, but it is not more important than the "other factors present in the balancing test," *id.* at 950.

Courts also "do not strictly apply a 'less intrusive means' test for searches [in civil commitment institutions, but do] consider the availability of less intrusive techniques when assessing the reasonableness of a challenged procedure." *Arnzen v. Palmer*, 713 F.3d 369, 374 (8th Cir. 2013) (affirming preliminary injunction entered by district court, in part, because the Iowa Civil Commitment Unit for Sex Offenders' installation of cameras in single-use restrooms constituted an invasive search where less intrusive methods were available to achieve the administrators' ends).

Taking the factual allegations in the Complaint as true and reading all reasonable inferences in the light most favorable to Mr. Gardner, the Court concludes that the Complaint plausibly alleges a violation of his Fourth Amendment rights. Several of the factors in the balancing test lead to that conclusion. First, Mr. Gardner was subjected to a very invasive search. As alleged in the Complaint, he was required to remove all of his clothing and expose his nude body to the visual inspection of MSOP staff members, one of whom recorded the encounter. Even considering the degree to which Mr. Gardner's privacy interests are circumscribed compared to individuals who are not civilly committed, *see Arnzen*, 713 F.3d at 373 (describing the "diminished scope" of an involuntarily civilly committed person's privacy rights), this search was a significant intrusion on his personal privacy.[4]

While the highly invasive nature of the search weighs against a finding of reasonableness, other circumstances somewhat mitigate the degree of intrusion. Specifically, there is no allegation that Ninneman, Gordon or any other MSOP staff members physically touched Mr. Gardner during the search and they conducted the search in a room that was separated from the rest of the MSOP

---

[4]    The intrusiveness of the search in this case was magnified by Mr. Gardner's experience of sexual abuse as a child, abuse that involved a video camera. And Mr. Gardner has alleged that he made the officers aware of this aggravating circumstance when he begged them to review the video before the strip search.

detainee population.[5] Nonetheless, although the search was not conducted in an "abusive manner," *Serna*, 567 F.3d at 954, it was nevertheless highly invasive.

Second, the Court finds that the lack of a minimal level of suspicion regarding Mr. Gardner's own conduct and the relative non-severity of the altercation weigh against a finding that the search was reasonable. As alleged in the Complaint, Mr. Gardner was not involved in the brief altercation that occurred prior to the search. There is no basis to infer that any member of the MSOP staff saw him attack anyone in the facility or engage in behavior that could reasonably have been mistaken for fighting. His only connection to the altercation was that he was standing near the other two detainees when they engaged in a short fight in which no one was injured. When Ninneman, Gordon, and the other MSOP staff conducted the search, they therefore lacked any particularized basis to suspect it was necessary. Mr. Gardner's mere propinquity to the other detainees could raise questions for MSOP staff, but taking the reasonable inferences in Mr. Garnder's favor, neither Ninneman nor Gardner had any specific reason to believe he was involved. Moreover, the "triggering evidence"—*i.e.*, a brief scuffle between two detainees where no injuries were sustained and no weapons were seen—did not suggest "a more acute danger" was present. *See Serna*, 567 F.3d at 951. The lack of any individualized suspicion pointing to Mr. Gardner or suggesting that he had a weapon indicate that this search was unreasonable. *See Serna*, 567 F.3d at 950–51.

The defendants argue that this case presents a stronger basis for justifying the search of Mr. Gardner than was present in *Serna*, a case in which the Eighth Circuit criticized MSOP staff members' use of institution-wide strip searches in response to finding an empty cell phone case at the facility, but ultimately found the approach did not violate the constitution. *See* Defs.' Reply at 3–4. They suggest that whereas individualized suspicion may have been lacking in *Serna*, the defendants here had "evident individualized suspicion of [Mr. Gardner]" because he was standing next to the other detainees who were involved in the incident. Defs.' Reply at 4. The Court disagrees with this line of argument for two reasons. First, as explained, the defendants had no basis for

---

[5]     *See Serna*, 567 F.3d at 954 (noting that staff members did not conduct the visual body-cavity searches at issue in "public or semi-public areas" or physically touch the plaintiff during the search).

suspecting Mr. Gardner was involved in the fight, possessed a weapon, or otherwise posed a threat to institutional security. To find otherwise would require the Court to draw inferences from the facts alleged in favor of the defendants. Because doing so runs contrary to the Court's task on a motion to dismiss pursuant to Rule 12(b)(6), this argument is rejected.

Moreover, this case differs from *Serna* in a meaningful way that the defendants fail to address. In *Serna*, the Eighth Circuit applied the Fourth Amendment balancing test from *Bell v. Wolfish* and affirmed the district court's grant of summary judgment in favor of the defendants, finding that it was reasonable for MSOP officials to require institution-wide unclothed visual body-cavity searches of all detainees after staff discovered a cell-phone case in a common area. *Serna*, 567 F.3d at 946–48, 949–55. On one side of the balance, the unique concerns presented by the presence of cell phones at the MSOP facility provided a strong justification for the search in the interests of maintaining institutional security. *Id.* at 953. The court developed its reasoning on this point at some length:

> [T]he administrators at Moose Lake explained that cell phones present a "grave security threat" in the context of sexually violent persons. The threat includes the potential to conduct criminal activity, including contacting past victims, grooming future victims, or securing child pornography.... Many cell phones also have photographic capabilities, which could be used to undermine institutional security by transmitting images of personnel or buildings to persons outside the facility. These context-specific concerns demonstrate that possession of a cell phone may "significantly increase the possibility that there will be breaches of security and that the safety of others will be placed in jeopardy." ... Cell phones and their potential to grant access to past or future victims for illegal purposes or to procure sexually explicit material also have the potential to negatively interfere with the Program's treatment goals. In fact, the reaction of a Moose Lake detainee who actually had a phone illustrates this point....
>
> Further, the administrators at Moose Lake had specific evidence and heightened concerns regarding cell phones—the cell-

phone case, the surveillance video, and a specific history regarding
contraband phones and patients' use of phones to commit crimes....
These facts indicate that the general justification for a search was
based upon concrete information and not merely upon "perceived
security concerns."

*Id.* at 953 (citations omitted).

This passage illustrates that the decision to conduct the facility-wide
visual body-cavity searches of all MSOP detainees at issue in *Serna* was found
to be reasonable because the summary-judgment record established a
heightened need for such an intrusive procedure. Beyond the general need to
maintain security at MSOP, the defendants in this case have offered no
comparable "concrete information," *Serna*, 567 F.3d at 953, indicating that the
search of Mr. Gardner was necessary to secure the institution. Their motion to
dismiss fails to show that the search was based on anything more than
"perceived security concerns." *Id.* (quoting *Goff v. Nix*, 803 F.2d 358, 363 (8th
Cir. 1986)) But such a broad rationale cannot, at this stage, justify the intrusive
search of Mr. Gardner. Nothing about the circumstances alleged in the Complaint
points to a basis for any MSOP staff member to have believed that Mr. Gardner
may have possessed a weapon or contraband and secreted it beneath his
clothing or in a body cavity. There is no specific allegation that the two other
detainees involved in the brief altercation had used a weapon. Nothing about the
incident that precipitated the intrusive search that was performed is comparable
to the heightened security concerns presented in *Serna* by the presence of a
cellular phone in the facility. In weighing the need for the search at issue here
against the intrusion on Mr. Gardner's rights based only on the allegations in the
Complaint, the need side of the scale is significantly lighter than it was in *Serna*.

Third, while a search is not unreasonable merely because a less intrusive
means of investigating may have been available, the fact that a less intrusive
alternative was readily available to address MSOP staff members' concerns in
this case weighs against the defendants' position that no Fourth Amendment
violation occurred. *See Arnzen*, 713 F.3d at 373 ("While we do not strictly apply
a less intrusive means test for searches ... we consider the availability of less
intrusive techniques when assessing the reasonableness of a challenged
procedure....") (internal citations omitted). The search of Mr. Gardner was
unreasonable, in part, because the officers involved could have addressed their

concerns through a far less intrusive method than the strip-search procedure they opted to deploy. Based on the facts alleged in the Complaint, it is reasonable to infer that at the time they conducted the strip search, the individual defendants knew they could have reviewed security footage of the incident to investigate who was involved. Indeed, they did so immediately after the strip search. And the eventual review of the surveillance video allowed the MSOP staff members to confirm that Mr. Gardner was in fact not involved in the fight. But by the time the footage was reviewed, Mr. Gardner's privacy interests had already been infringed. While deference is owed to the judgments of correctional officers about how best to ensure security at an institution like MSOP, the defendants here offer no meaningful explanation why security concerns in this circumstance required them to take the highly invasive approach they did when a much less intrusive option was readily available.

Based on the foregoing, the Court concludes that the Complaint states a plausible claim for a violation of Mr. Gardner's Fourth Amendment rights. Having considered the relevant factors and conducted the balancing required, the strip search described in the Complaint was unreasonable because there was very little need for the particular search that was conducted and MSOP's interest in institutional security was outweighed by Mr. Gardner's interest in personal privacy.

### Qualified Immunity

Although the Court has found that Mr. Gardner has stated a plausible claim that the strip search at issue violated his Fourth Amendment rights, that does not end the inquiry. The individual defendants allege that they are entitled to qualified immunity because, even if Mr. Gardner had a right to be free from the search at issue, that right was not clearly established at the time the search occurred. The Court agrees.

Under the doctrine of qualified immunity, an individual government official is not liable for civil damages for discretionary acts that do not violate clearly established constitutional rights of which a reasonable person would have known. *Moore ex rel. Moore v. Briggs*, 381 F.3d 771, 772 (8th Cir. 2004). Under the second prong of the qualified immunity analysis, courts "ask whether the right was clearly established" at the time of the alleged violation, which means that the "'contours of the right must be sufficiently clear that a reasonable

official would understand that what he is doing violates that right.'" *Serna*, 567 F.3d at 951–52 (quoting *Buckley v. Rogerson*, 133 F.3d 1125, 1128 (8th Cir. 1998)).

This standard does not require a plaintiff to identify "'a case directly on point, but existing precedent must have placed the ... constitutional question beyond debate.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Whether an official is entitled to qualified immunity depends on "'whether the violative nature of the *particular* conduct is clearly established.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 742) (emphasis in *Mullenix*). The more generalized a statement of the law, the less likely it is to have placed an officer on clear warning that his or her conduct was unconstitutional because it is not "particularized to the facts of the case." *See White v. Pauly*, 137 S. Ct. 548, 552 (2017); *see also Sumpter v. Wayne County*, 868 F.3d 473, 485 (6th Cir. 2017) ("Because case-by-case incremental decisionmaking of balancing tests ... infrequently will provide the fair notice that qualified-immunity precedent requires ... courts generally accord public officials wide latitude (for qualified-immunity purposes) when the constitutionality of their acts comes down to the subtleties of interest balancing.") (citations, quotation marks, and alterations omitted).

Mr. Gardner argues that prior to the February 18, 2016 search in this case, it was clearly established the conduct of Ninneman and Gordon violates the Fourth Amendment. Pl.'s Resp. at 17–19. In support of his argument, Mr. Gardner cites *Bell v. Wolfish*, 441 U.S. 520 (1979), and *Serna v. Goodno*, 567 F.3d 944 (8th Cir. 2009). Although the Court agrees that the search violated Mr. Gardner's rights, for several reasons, the Court finds that these cases do not place the constitutional question—whether the search in this case violated the Fourth Amendment—beyond debate. First, the rule Mr. Gardner claims that *Bell* clearly established—"that a correctional officer can be held liable under the Fourth Amendment if he forces a detainee to be subjected to a strip search when there is no need for the strip search to occur"[6]—is simply set forth at "too high a level of generality" to be useful in putting the individual officers here on notice that their particular conduct was unconstitutional. *See White*, 137 S. Ct. at 552.

---

[6]    Pl.'s Resp. at 17.

That decision articulates a broad principle—that unnecessary strip searches are potentially unlawful—but it gives little specific guidance for what qualifies as unnecessary.

Second, the facts involved in *Bell* and *Serna* are not sufficiently "particularized to the facts" of this case for the Fourth Amendment violation stated in Mr. Gardner's Complaint to have been clear at the time he was searched. *See White*, 137 S. Ct. at 552 ("As this Court explained decades ago, the clearly established law must be particularized to the facts of the case.") (internal quotations omitted). In *Bell* the Supreme Court held that there was no Fourth Amendment violation caused by the facility's policy requiring all detainees "to expose their body cavities to visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution." 441 U.S. at 558. And *Serna* addressed the MSOP facility's institution-wide response (involving visual body-cavity searches of all MSOP detainees) to the discovery of a cell phone case. 567 F.3d at 946. The facts of this case are quite distinct, involving neither institution-wide searches, nor contact visits, nor the discovery of serious contraband. Though clearly established case law need not be directly on point, to overcome qualified immunity, a plaintiff must nevertheless point to some decision that is sufficiently similar to the facts of his own case that a reasonable officer would know the conduct he engaged in was prohibited. Neither *Bell* nor *Serna* do that.

More critically, in both *Bell* and *Serna* the challenged searches were ultimately found to be reasonable under the Fourth Amendment. *Bell* addressed "the question whether visual body-cavity inspections as contemplated by the [facility's] rules can *ever* be conducted on less than probable cause," and concluded that they can. 441 U.S. at 560. And although the Eighth Circuit expressed concerns about the closeness of the question presented in *Serna*, it held that it was not unreasonable for MSOP officials to conduct the institution-wide strip searches of all detainees after discovering the empty cell phone case. 567 F.3d at 955. It is difficult to see how the determinations in *Serna* and *Bell* affirming the lawfulness of the searches in those contexts could have placed Ninneman and Gordon on notice that their search of Mr. Gardner was unreasonable.

Mr. Gardner also relies on *Jones v. Edwards*, 770 F.2d 739 (8th Cir. 1985), to argue that the law clearly established that Ninneman and Gordon's conduct was unconstitutional. In *Jones*, the Eighth Circuit concluded that the district court should have granted the plaintiff's motion for judgment notwithstanding the verdict in a § 1983 case where the plaintiff was strip searched following his arrest for violation of a leash law. *Id.* at 739–40, 742. Mr. Jones was given a citation for allowing his dog to wander around a neighborhood off his leash, but he refused to sign the citation promising that he would appear in court and was verbally abusive toward an animal control officer and a police officer who assisted in serving the citation. *Id.* at 740. A county attorney presented a judge with an arrest warrant for Mr. Jones because he declined to sign an appearance bond and he was arrested the following morning. *Id.* Mr. Jones was brought to the county jail, where he became loud and verbally abusive during the booking procedure, but he did not attempt to abuse anyone physically. *Id.* The final step of the booking procedure involved "a non-contact visual strip search of Jones; one jailer stepped with Jones (who was nude) into a sheltered alcove and visually inspected Jones's anal and genital area." *Id.* Applying the balancing test developed in *Bell v. Wolfish*, the Eighth Circuit found that the district court should have granted the motion for judgment notwithstanding the verdict and found the search was unreasonable because: (1) an arrest for failing to sign a summons and complaint arising from a leash law violation is not "the sort of crime to inspire officers with the fear of introducing weapons or contraband into a holding cell"; (2) officers had no other reason to believe Mr. Jones had a weapon or contraband; (3) no less-intrusive alterative was attempted that may have detected prohibited items; (4) the search that was conducted involved a "broad" invasion, though it was not "brutal"; and (5) the search was conducted in an area that was only fortuitously private. *Id.* at 742.

While instructive, the circumstances of *Jones* are simply not similar enough to the circumstances here for the Court to conclude that *Jones* clearly established the unconstitutional nature of the search of Mr. Gardner. *Jones* does not tell a reasonable officer at a facility where civilly committed sex offenders are housed that it is unlawful to conduct a strip search of a detainee who is discovered in an area where other inmates are fighting. *Jones* provides only general guidance about the impropriety of searches in the absence of any particularized suspicion, reason for heightened security concerns, failure to

consider less intrusive alternatives, and where the search is conducted in a location that is not sufficiently secluded from others. Therefore, its holding does not put the constitutional question about the search in this case beyond dispute.

Finally, Mr. Gardner cites *Does v. Ninneman*, 612 F. Supp. 1069 (D. Minn. 1985). In *Ninneman*, the district court granted summary judgment to the plaintiffs, two pretrial detainees, who claimed that a strip search conducted pursuant to Chisago County's policy was unconstitutional. *Id.* at 1069, 1072. Both of the plaintiffs were arrested for minor offenses (failing to appear at a child-support hearing and driving after revocation of a license). *Id.* at 1070. When they were booked into the county jail, they were strip searched in accordance with the county's booking policy, which required all persons who were to be placed in the general jail population to submit to a "complete visual search," including "visual inspection of the rectal and genital areas." *Id.* The plaintiffs brought suit under § 1983 alleging that the indiscriminate policy as applied to them was a violation of their Fourth Amendment rights, and the district court agreed. *Id.* at 1070–72. Applying the framework established in *Bell v. Wolfish*, the court concluded that "the scope of the searches exceeded the demonstrated need," where there was no evidence that the plaintiffs presented a particular security risk and there was no reasonable suspicion that they possessed contraband or weapons. *Id.* at 1071–72. Like *Jones*, this decision lacks a sufficient factual alignment with the circumstances presented in Mr. Gardner's case that the individual officers should have been on notice that their conduct involved a constitutional violation. *Ninneman* stands for the proposition that it is unreasonable to conduct a strip search of all detainees (including those arrested for minor offenses where there is no reasonable suspicion that they possess weapons or contraband) upon arrival at a jail. But that proposition does not give adequate guidance about the unconstitutionality of an unclothed visual body inspection of a civilly committed detainee under the circumstances at issue in Mr. Gardner's case.[7]

---

[7]  Both *Jones*, 770 F.2d at 741–42, and *Ninneman*, 612 F. Supp. at 1072, found the strip searches could not be conducted without reasonable suspicion largely because the plaintiffs in each case had been arrested for misdemeanor or minor offenses. Several years after *Jones* and *Ninneman* were decided, the

Because the case law did not clearly establish at the time of the search that Ninneman and Gordon's conduct was unconstitutional, they are entitled to qualified immunity from Mr. Gardner's Fourth Amendment claim. *See Wilson v. Layne*, 526 U.S. 604, 617 (1999) (providing that a plaintiff must either identify "cases of controlling authority in their jurisdiction at the time of the incident" or "a consensus of persuasive authority such that a reasonable officer could not have believed that his actions were lawful" to overcome qualified immunity). The individual-capacity claims against them should, therefore, be dismissed.

### Wrong Defendants for Prospective Injunctive Relief

The Court's conclusions regarding qualified immunity do not fully resolve the defendants' motion. The Court has concluded that the Fourth Amendment claim Mr. Gardner alleged should not be dismissed pursuant to Rule 12(b)(6). However, the qualified immunity that bars the individual-capacity claims against Ninneman and Gordon does not extend to the official-capacity claims against them. *See Eggenberger v. West Albany Tp.*, 90 F. Supp. 3d 860, 863 (D. Minn. 2015) ("A suit against a public employee in his or her official capacity is merely a suit against the public employer. Qualified immunity is not a defense available to governmental entities, but only to government employees sued in their individual capacity.... Because Moeching is sued in his official capacity and not his individual capacity, qualified immunity is unavailable.") (citations and quotation marks omitted). And under the exception recognized in *Ex parte Young*, the Eleventh Amendment immunity that bars any official-capacity claims for damages does not extend to Mr. Gardner's claims for prospective injunctive relief concerning the alleged Fourth Amendment violation. Therefore, none of

---

Supreme Court decided *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318 (2012). In *Florence*, the Court rejected the proposition that prior to being placed in the general population of a jail, a person arrested for a misdemeanor offense could not be subjected to an unclothed visual search without reasonable suspicion that he possessed contraband or a weapon. *Id.* at 331–39. *Florence*, therefore, calls into question the continuing validity of *Jones* and *Ninneman*. *See Rattray v. Woodbury County, Iowa*, 908 F. Supp. 2d 976, 986–95 (N.D. Iowa 2012) (examining *Florence* and concluding that it overruled *Jones* and other authority requiring reasonable suspicion to strip search misdemeanants).

the foregoing discussion resolves Mr. Gardner's official-capacity claims against Ninneman and Gordon for prospective injunctive relief.

Nevertheless, the defendants argue that those claims should be dismissed because neither Ninneman nor Gordon allegedly has any policy-making role with respect to how and when searches may be conducted at the MSOP facility. Defs.' Mem. at 13–14. In support of this argument the defendants cite *Billings v. N. Dakota State Penitentiary*, No. 1:07-cv-066, 2007 WL 4380056, at *3 (D.N.D. Oct. 26, 2007), *report and recommendation adopted*, No. 1:07-cv-066, 2008 WL 243958 (D.N.D. Jan. 28, 2008). There, a magistrate judge explained that the plaintiff seeking to obtain prospective injunctive relief against state officials in their official capacities would have to "name a state official who would be authorized under state law to provide the [prospective injunctive] relief requested, which may very well be a person different from those who may be liable for any damages." *Id.*

Other authority supports the defendants' position that official-capacity claims for prospective injunctive relief should be asserted against defendants who are capable of making policy changes. *See, e.g., Marshall v. Annucci*, 2018 WL 1449522, at *8 (S.D.N.Y Mar. 22, 2018) ("In order to survive a motion to dismiss a request for injunctive relief, a plaintiff must allege that the state official has the authority to grant the relief sought.") (alterations and internal quotation marks omitted); *Kuck v. Danaher*, 822 F. Supp. 2d 109, 148 (D. Conn. 2011) ("Plaintiffs have failed to name a proper defendant who would be able to provide prospective injunctive relief in connection with the appeals backlog.... Plaintiffs could only obtain prospective injunctive relief if they sued an official capacity defendant who could meet the requirements of *Ex parte Young*."); *Roberts v. California Dep't of Corr.*, 2007 WL 951289, at *2 (N.D. Cal. Mar. 27, 2007) ("Although Plaintiff has requested injunctive and declaratory relief, neither of these Defendants are subject to the exception to Eleventh Amendment immunity applicable to prospective injunctive relief; the exception applies only to state officials with the ability to provide injunctive relief in their official capacities."); *Schallop v. New York State Dep't of Law*, 20 F. Supp. 2d 384, 391 (N.D.N.Y 1998) (stating that the *Ex parte Young* exception to Eleventh Amendment immunity "only applies in circumstances where the state official has the authority to perform the required act" and finding that official-capacity

claims against two defendants who lacked authority to reinstate the plaintiff should be dismissed).

The Court agrees with the defendants that the facts alleged suggest that neither Ninneman nor Gordon could provide the prospective injunctive relief Mr. Gardner seeks in his Complaint. Nothing in the record here indicates that even if Mr. Gardner prevailed at trial, Ninneman or Gordon would be in a position to carry out an injunction "ordering Defendants State of Minnesota, DHS, and MSOP to implement new policies and training which prohibit and discourage unjustified and unreasonable strip searches of MSOP clients." Compl., Prayer for Relief ¶ d. Accordingly, the Court recommends that the official-capacity claims for prospective injunctive relief against Ninneman and Gordon be dismissed because they are the wrong defendants.

Because he has adequately stated a Fourth Amendment violation as described above, this Court also concludes that Mr. Gardner should be given leave to file an amended complaint that asserts that claim against the appropriate state officers in their official capacities for prospective injunctive relief. *See Kuck*, 822 F. Supp. 2d at 156 (granting the plaintiffs "leave to amend their complaint within fourteen days of this Order to name an official capacity defendant who could provide injunctive relief under count two" of the complaint).

## VII. Recommendation

Based on the foregoing, the Court makes the following recommendation:

1. The defendants' defendants' motion to dismiss, **ECF No. 12**, should be **GRANTED**.

2. The Court lacks jurisdiction over the § 1983 claims against the State of Minnesota, the Minnesota Department of Human Services, and the Minnesota Sex Offender Program. The Court also lacks jurisdiction over any official-capacity claims under § 1983 for monetary damages. Those claims should be dismissed without prejudice on grounds of sovereign immunity.

3.  Mr. Gardner's § 1983 claims alleging violations of his substantive and procedural due process rights should be dismissed with prejudice for failure to state a claim.

4.  Mr. Gardner's individual-capacity § 1983 claims against defendants Brian Ninneman and Randy Gordon for violation of his Fourth Amendment rights should be dismissed with prejudice for failure to state a claim based on qualified immunity.

5.  Mr. Gardner's official-capacity claims seeking prospective injunctive relief for violations of his Fourth Amendment rights against defendants Ninneman and Gordon should be dismissed because there are no allegations that either of these defendants can make any of the policy changes requested in Mr. Gardner's prayer for relief. However, Mr. Gardner should be given leave to replead his official-capacity claims for prospective injunctive relief by identifying a proper defendant.

Date: January 15, 2019

*s/Katherine Menendez*
Katherine Menendez
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under

advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.